UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JAMES FRANKLIN SNYDER,<br><br>        Plaintiff,<br><br>    v.<br><br>KATLIN LYNN ROBINSON,<br>BRANDON COLT BOWCUT,<br>DONALD LAMAR HORTON,<br>CODEY DEBIAS,<br><br>        Defendants. | Case No. 2:21-cv-00328-BLW<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

## INTRODUCTION

Pending before the Court are the following motions: (1) Defendant Codey Debias' Motion for Summary Judgment (Dkt. 21); (2) Kootenai Defendants' Motion for Summary Judgment (Dkt. 25); (3) Snyder's Motion to Stay (Dkt. 29); Snyder's Motion for Reconsideration for Appointment of Counsel (Dkt. 30); Snyder's Motion Clerk to Distribute Letter to Defendants (Dkt. 34); and Snyder's Motion: Additional Information for Motion to Stay (Dkt. 35). Each motion is fully briefed and at issue. For the reasons set forth below, the Court will deny Snyder's motions and grant Defendants' motions for summary judgment.

MEMORANDUM DECISION AND ORDER - 1

## BACKGROUND

### 1. Snyder's Allegations

Plaintiff James Franklin Snyder filed his Complaint in this action on August 16, 2021, alleging violations of his civil rights under 42 U.S.C. § 1983 for alleged constitutional violations against three individuals he identifies as employees of the Kootenai County Hospital Emergency Department, including Katie Robinson, Brandon Bowcut, and Donald Horton ("Kootenai Defendants), and one police officer, Officer Codey Debias. His claims arise out of an incident that occurred at Kootenai Health hospital, where Snyder had been admitted to the emergency room on June 29, 2021. At the hospital, Snyder, a Seventh Day Adventist, alleges that the Kootenai Defendants forced him to take medication in violation of his religious beliefs, and when he refused, he alleges the "healthcare workers and cops punched me with closed fists for around 2 minutes," reinjuring his brain injury and triggering his PTSD. *Compl.*, p. 4, Sec. C, Dkt. 1.

Snyder further alleges that "Katlin [sic] the nurse setup the violent attack on me by the guards and police officer," and "Brandon colt Bowcut, Donald Lamar Horton, violently attacked James Snyder with no justifiable reason." *Id.*, p. 5, Sec. D. According to Snyder, "I wouldn't take their medication, so they surrounded my

MEMORANDUM DECISION AND ORDER - 2

hospital bed and triggered my PTSD. *Id.* He claims, "They knew they were going to get violent before they even came in the room. They didn't approach my bed to try and restrain me. They ran over to my bed and just started punching me." *Id.*

With respect to Officer Debias, Snyder alleges the "video shows the officer ran up and just started throwing hard blows landing on Mr. Snyder" and "let other civilians punch Mr. Snyder as well along side him." *Id.* Although Snyder did not explicitly say so in his Complaint, it could be gleaned from the record that he pled guilty to misdemeanor battery on Defendants following this incident. *Mot. for State Action*, p. 1, Dkt. 5.  In his Complaint, Snyder claimed that Defendants "lied in there [sic] statements saying, 'I hit them.'" *Compl.*, p. 4, ¶ C, Dkt. 1.

On December 1, 2021, the Court entered an Initial Review Order limiting Snyder's claims against Defendants. After a liberal forma pauperis review, Snyder's remaining § 1983 claims against Kootenai Defendants include: (1) a First Amendment violation against Defendant Katlin Robinson for the alleged forcible injection of medication in knowing violation of his religious freedoms; (2) a Fourteenth Amendment right to bodily integrity claim against each Kootenai Defendant for the alleged forcible injection of a sedative without consent; and (3) a Fourth Amendment excessive force claim against Defendants Brandon Bowcut and Donald Horton for their actions during an alleged unconstitutional seizure. Snyder

also brings a Fourth Amendment excessive force claim against Defendant Codey

Debias. *Initial Review Order by Screening Judge*, p. 24.

### 2. Snyder's Admission to the ER and Physician Hold

Snyder presented to Kootenai Health's Emergency Department (ED) on June

29, 2021, via ambulance where he was seen by an independent emergency medical

physician for concerns of overdose, heat exposure, and suicidal ideation after he

was found naked on someone else's property by his parole officer. *Armstrong*

*Decl.*, Ex. A, pp. 6-11, Dkt. 25-3. During the evaluation, Snyder reported he

consumed fifty-two 50 mg pills of amitriptyline, an antidepressant, and took a

significant amount of methamphetamine. *Id.*, Ex. A, pp. 6, 10. Upon evaluation,

Snyder was diagnosed as having significant acute kidney injury, tachycardia, and

mental delusions. *Id.*, Ex. A, p. 11.

Patrick Magajna, M.D., an independent emergency medical physician,

placed Snyder on a physician hold pursuant to Idaho Code § 66-326 after

determining he was a danger to himself, required medical treatment for his

overdose, acute kidney injury, and dehydration, and that he was unable to be safely

discharged. *Id.*, Ex. A, pp. 11, 56, 266. Once learning of the physician hold, Snyder

verbally threatened Dr. Magajna, stating phrases such as, "eye for an eye tooth for

tooth I will come get you for doing this." Snyder's parole officer was present and

physically prevented Snyder from leaving his gurney. *Id.*, Ex. A., at pp. 9, 11, 95.

MEMORANDUM DECISION AND ORDER - 4

Law enforcement was called, and Officer Wolfinger and the defendant, Officer Debias, were the two officers dispatched to the scene. Dr. Maganja gave a statement to Officer Wolfinger in the Emergency Department hallway. Dr. Maganja told the officer that he feared for his and other hospital staff's safety while attending to Snyder. *Brereton Decl.*, Ex. C, Dkt. 21-3.

While Dr. Maganja gave his statement to Officer Wolfinger, Katie Robinson, a Mental Health Specialist ("MHS"), was attempting to deescalate Snyder and to explain to him that the doctor is allowed to put the patient on hold due to the patient's health and safety concerns. She told Snyder that he was not going to be released and would not be able to leave the hospital due to his suicidal statements. MHS Robinson noted Snyder appeared delusional and documented his aggressive verbal comments, including: "Dr. is a pussy fuck who is not allowed to put me on a hold... I'm part of the Mexican mafia I know people and all I have to do is make one phone call. I'm also working with the FBI and I'm a part of important things with them... I know my rights and I'll sue every single one of you here. You can't mother fucking hold me. Fuck you guys." *Armstrong Decl.*, Ex. A., at p. 95, Dkt. 25-3.

Officer Debias, who was standing in the hall while Dr. Magajna spoke to Officer Wolfinger, overheard Snyder's berating Robinson. He noted that when Snyder was speaking to Robinson, Snyder's voice elevated to a yell and his tone

MEMORANDUM DECISION AND ORDER - 5

was threatening. When MHS Robinson left Plaintiff's room, she told Officer

Debias that she believed Snyder was going to attack her and other hospital staff.

Officer Debias observed Snyder for several moments and observed him to have

rapid speech, involuntary clenching of the jaw, and an inability to control the

movement of his extremities. Officer Debias recognized these signs to be

consistent with a person under the influence of a CNS stimulant, such as

methamphetamine. *Brereton Decl.*, Ex. C, Dkt. 21-3.

After Snyder had been informed that he would not be released, a short time

later, Dr. Magajna decided that he would prescribe a sedation medication, and

requested that Officer Wolfinger and Officer Debias remain on scene. Officer

Wolfinger explained to hospital employees that this was a medical issue, and he

and Officer Debias would only intervene if someone's safety appeared to be at

risk. Defendants Robinson, Donald Horton, and Brandon Bowcut entered Snyder's

room, and Snyder immediately began screaming and swearing at them and making

vague threats. *Brereton Decl.*, Ex. C, Dkt. 21-3; *Armstrong Decl.*, Ex. A., pp. 95-

96, Dkt. 25-3; *Robinson Decl.* ¶ 5, Ex. B at 00:38-01:25, Dkt. 25-4. Snyder refused

to take the physician-ordered medications and became increasingly agitated and

threatening while MHS Robinson spoke to him. Because of Snyder's aggressive

behavior toward staff and policy, Dr. Magajna placed a physical restraint order.

*Armstrong Decl.*, Ex. A., at pp. 56, 60, 266. Dkt. 25-3.

**MEMORANDUM DECISION AND ORDER - 6**

During this time, Officer Wolfinger and Officer Debias remained in the hallway outside of Snyder's room and observing his behavior. Officer Wolfinger observed Snyder making aggressive movements towards everyone in the room, which included squaring his body up towards Defendant Horton and pushing his chest out towards him, and raising his hands in the air with closed fists as if he was going to strike someone. Defendant Robinson continued to try and explain to Snyder that he had been prescribed a medication by the doctor, and he needed to allow medical personnel to administer the medication. Snyder kept yelling that it wasn't going to happen. Officer Debias observed Snyder place both his hands on the railings of the bed and push himself up, while simultaneously trying to bring his feet under him. Officer Debias also noted that Snyder began to breathe rapidly, and based on his training and experience, he recognized these behaviors as pre-fight indicators. *Brereton Decl.*, Ex. C, Dkt. 21-3.

Snyder then looked directly in Officer Wolfinger's direction and attempted to jump off the hospital bed. As Snyder attempted to lunge towards Officer Wolfinger's direction, Defendants Horton and Bowcut grabbed Snyder around the torso/head area. Due to Snyder's aggressive and erratic behavior, Officer Wolfinger felt that without intervention there was a likelihood that hospital staff would be injured. Officer Wolfinger and Officer Debias then attempted to grab Snyder's legs to prevent him from kicking hospital staff. As Officer Wolfinger

grabbed onto Snyder's leg, he observed Snyder swing and hit Defendant Horton on the side of the head. Snyder then lunged towards the end of the bed towards Officer Debias. As Snyder attacked Office Debias, Officer Wolfinger observed Snyder hit Officer Debias on the top of the head with an open hand. After Snyder struck Debias, he then swung and hit Defendant Bowcut in his left pectoral area. *Brereton Decl.*, Ex. C, Dkt. 21-3.

With attempts to control Snyder "with soft hand controls" not working, and in attempting to gain compliance and control of Snyder, Officer Wolfinger performed three to four closed fist strikes to the area of Snyder's left hip. Office Wolfinger also observed Defendants Horton and Bowcut strike Snyder on the upper portion of his body. During this same course of events, Officer Debias observed Snyder's kicking his legs and flailing his upper body in order to free himself. Snyder continued to actively fight Defendants Horton, Bowcut, and Debias and Officer Wolfinger, and kicked his legs and upper body, and delivered more strikes. Officer Debias also performed approximately five closed fist strikes to Plaintiff's left hip area during the altercation. *Brereton Decl.*, Ex. C, Dkt. 21-3.

Throughout the incident, Snyder was told multiple times to stop resisting/fighting. After the incident, Officer Wolfinger spoke with Defendant Horton who informed Wolfinger that he had been punched in the face and the side of the head and had received a small laceration to his left wrist. While examining

Defendant Horton, Officer Wolfinger observed a swollen lower lip, a red mark to the right side of his head, and a small scratch on his left wrist. Officer Wolfinger then spoke with Defendant Bowcut who informed Wolfinger that that he had been punched in the left pectoral area and had received a small laceration to his right elbow area. Upon examining Defendant Bowcut, Officer Wolfinger noted blood on his elbow but no other injuries. Officer Wolfinger interviewed Officer Debias who stated he did not receive any injuries from Snyder striking him. Defendants Horton, Bowcut, and Debias all reported to Officer Wolfinger that they wished to pursue charges against Snyder. Due to Snyder being under a physician's hold, Officer Wolfinger did not arrest Snyder at that time. *Brereton Decl.*, Ex. C, Dkt. 21-3.

Under the physician's order to treat his agitation, a hospital nurse gave Snyder an intramuscular injection of Haloperidol, Lorazepam, and diphenhydramine while he was physically held by security and police. *Armstrong Decl.*, Ex. A., pp. 10, 213; *Robinson Decl.*, Ex. B at 01:50-02:00. Snyder was then placed on a physical restraint board in accordance with the physician's orders and subsequently treated by medical providers. *Armstrong Decl.*, Ex. A., pp. 11, 56, 207, 213. On June 30, 2021, Snyder was seen by a designated examiner. The designated examiner lifted the hold, and Snyder declined further medical

treatment. Snyder was discharged to law enforcement, and Snyder was transported to jail. *Id.*, Ex. A, pp. 196, 210-211.

### Defendant Katie Robinson

As noted, Katie Robinson is an MHS who spoke with Mr. Snyder on June 29, 2021. She did not have any knowledge of Snyder's religious beliefs, and nothing in his medical records indicated he was a Seventh Day Adventist. MHS Robinson informed Mr. Snyder of the physician hold, medications orders and provided him with the option to comply voluntarily prior to any involuntary actions being taken. She testifies in her declaration that she did not physically restrain Snyder, and she did not inject Snyder with the intramuscular sedative on June 29, 2021. *Robinson Decl.*, Dkt. 25-4.

### Defendant Donald Horton

Donald Horton was the lead security officer called to assist with the physician hold and restraint of Snyder on June 29, 2021. Horton was told that Snyder was going to get an intramuscular injection because he was refusing to cooperate with the physician's orders and was very aggressive when he was told he was being placed on a physician's hold. When Snyder rose from his gurney and appeared to be trying to attack MHS Robinson, Horton assisted law enforcement and the other security personnel in physically restraining Snyder.

MEMORANDUM DECISION AND ORDER - 10

Horton was punched by Snyder in the lip and side of his head while trying to control Snyder's arms and upper body. Horton performed arm strikes on Snyder to gain his compliance and allow for nursing staff to provide medication. Horton did not inject Snyder with any medication. *Horton Decl.*, Dkt. 25-5.

### Defendant Brandon Bowcut

Brandon Bowcut was a security officer called to assist with the physician hold and restraint of Mr. Snyder on June 29, 2021. He had been informed that Snyder was placed on a physician hold, and he personally witnessed Snyder refuse to cooperate when provided the option to take oral medication or receive an injection. Bowcut assisted in the physical restraint of Snyder. He had his hand pinned under the patient and against the side of the bed, which required him to kneel on the bed to get his arm out. Bowcut did not inject Mr. Snyder with any medication. *Bowcut Decl.*, Dkt. 25-7.

### Officer Codey Debias

Officer Codey Debias was one of the law enforcement officers dispatched for a possible assault of a healthcare worker. Officer Debias overheard Snyder using aggressive language toward MHS Robinson and refusing to take medication voluntarily. He also witnessed Snyder become aggressive toward the hospital security officers and assisted them in restraining Snyder after determining Snyder would likely injure hospital staff if he and Officer Wolfinger did not intervene.

While attempting to restrain Snyder, Officer Debias performed approximately five closed fist strikes to Snyder's left hip area during the altercation with Snyder. *Brereton Decl.*, Ex. C, Dkt. 21-3.

### 3. Criminal Charges and Snyder's Guilty Plea

Snyder was criminally charged with multiple counts of felony battery on a healthcare worker for the events of June 29, 2021. The state court entered a Probable Cause Order on July 1, 2021, finding that there was probable cause to believe that Plaintiff had committed the following offenses: two felony counts of Battery on a Health Care Worker, in violation of Idaho Code § 18-915C; one count of misdemeanor Assault, in violation of Idaho Code § 18-901; and one count of Assault or Battery on Certain Personnel, in violation of Idaho Code § 18-915.

On August 5, 2021, an Amended Criminal Complaint was filed against Plaintiff in Case No. CR28-21-11291. The Amended Complaint consolidated Counts I and II into Count I Idaho Code § 18-903; Count II charged Plaintiff with misdemeanor Assault or Battery Upon Certain Personnel, identifying Defendant Debias as the victim, in violation of Idaho Code §§ 18-915 and 18-903(b).

On September 2, 2021, Snyder pleaded guilty to Counts I and II in the Amended Complaint. On Count I, Battery, he was sentenced to 38 days in jail with credit for 38 days served and a $300 fine inclusive of costs. On Count II, Assault or Battery Upon Certain Personnel, he was sentenced to 180 days of jail, with 112

days suspended, credit for 38 days served, and 30 days unscheduled; two years of supervised probation; a $300 fine inclusive of court costs, and $200 in fees for reimbursement for the public defender. *Orlando Decl.*, Ex. D; *Brereton Decl.,* ¶ 8, Dkt. 21-3.

## LEGAL STANDARD

### 1. Pro Se Litigants

Pro se litigants are held to a lesser pleading standard than are parties represented by counsel. *See Federal Exp. Corp. v. Holowecki*, 552 U.S. 389, 402 (2008) (pro se pleadings are to be "liberally construed"). However, pro se litigants are still required to comply with both the Local Rules of this District and the Federal Rules of Civil Procedure, including pleading requirements and filing deadlines. See D. Idaho Local Rule Civil 83.7.

### 2. Motion to Stay

A court's power to stay proceedings is incidental to the inherent power to control the disposition of the cases in the interests of efficiency and fairness to the court, counsel, and litigants. *Landis v. N. Am. Co*., 299 U.S. 248, 254 (1936). The Court has the inherent power to stay proceedings to achieve equality and ensure the efficient management of its docket. *Clinton v. Jones*, 520 U.S. 681, 706-707 (1997). In deciding whether to grant a stay in the proceedings, the Court must weigh the competing interests of the parties, considering in particular; (1) possible

damage which may result from the granting of the stay, (2) the hardship or inequity which a party may suffer in being required to go forward, and (3) the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay. *Lockyear v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005). If there is a fair possibility that the stay "will work damage to someone else," the party seeking the stay "must make out a clear case of hardship or inequity." *Landis*, 299 U.S. at 255.

In addition, Federal Rule of Civil Procedure 56(d) provides that, when facts are unavailable to the nonmoving party, he may be granted additional time to obtain the facts needed to contest the motion for summary judgment. To warrant application of this subsection, the nonmoving party must show by affidavit or declaration that, for specified reasons, he cannot present facts essential to justify his opposition. *Id.*; *Employers Teamsters Local Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.*, 353 F.3d 1125, 1129 (9th Cir. 2004). The Court has the following options in ruling on the motion: "(1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

### 3. Motion for Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Material

facts are those which may affect the outcome of the case. *See Anderson v. Liberty*

*Lobby, Inc*., 477 U.S. 242, 248 (1986).

In a motion for summary judgment, the moving party bears the "initial

burden of identifying for the court those portions of the record which demonstrate

the absence of any genuine issues of material fact." *T.W. Elec. Serv., Inc. v. Pacific*

*Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986)). If the moving party points to portions of the

record demonstrating that there appears to be no genuine issue of material fact as

to claims or defenses at issue, the burden of production shifts to the non-moving

party. To meet its burden of production, the non-moving party "may not rest upon

the mere allegations contained in his complaint, but he must set forth, by affidavits,

exhibits or otherwise, specific facts showing that there is a genuine issue for trial."

Fed.R.Civ.P. 56; *see T.W. Electric Serv*., 809 F.2d at 630 (internal citation

omitted).

The Court does not determine the credibility of affiants or weigh the

evidence set forth by the non-moving party. All inferences that can be drawn from

the evidence must be drawn in a light most favorable to the nonmoving party. *T.W.*

*Elec. Serv*., 809 F.2d at 630–31 (internal citation omitted).

**MEMORANDUM DECISION AND ORDER - 15**

Rule 56(c) requires the Court to enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby*, 477 U.S. at 252.

## ANALYSIS

### 1. Motion to Stay

Snyder asks the Court to stay this matter "until Plaintiff is able to properly exsert [sic] himself in a legal manner, and or until appeals are exhausted." *Pl's Mot. to Stay*, p. 2., Dkt. 29. To obtain a stay on appeal, Snyder must show the probability of irreparable harm plus either: "(a) a strong likelihood of success on the merits and that the public interest does not weigh heavily against a stay; or (b) a substantial case on the merits and that the balance of hardships tips sharply in the petitioner's favor." *Leiva-Perez v. Holder*, 640 F.3d 962, 970 (9th Cir. 2011). But Snyder does not even explain to which appeal he refers, much less show that he has a strong likelihood of success on the merits or a substantial case on the merits and that the public interest does not weigh heavily against the stay or the balance

of hardships tips in his favor. Thus, Snyder has failed to show that a stay until all appeals are exhausted would be appropriate.

Even if the Court were to liberally construe Snyder's motion as a motion pursuant to Rule 56(d), such motion would still fail. Snyder does not show by affidavit or declaration that, for specified reasons, he cannot present facts to justify his opposition. Rather, he just claims generally that he has experienced "ongoing issues incarcerated with no legal supplies, materials for copying to maintain FRCP." *Id.* Snyder, however, does not identify what materials he is unable to obtain or the significance of those materials in responding to summary judgment. Instead, Snyder asserts that he has been mistreated at the prison and asks the Court to "launch a federal investigation into the crimes committed against [him]." *See* Dkt. 29-1 at 2. While the Court would lament Snyder's being mistreated, if true, such allegations are not properly before this Court, and the Court does not have the power to "launch a federal investigation."

In short, Snyder has not put forth a basis to stay this case pursuant to the inherent power of the Court or Rule 56(d). Such motion is therefore denied.

## 2. Motion for Summary Judgment

### A. 42 U.S.C. § 1983 – General Standard

Section 1983 provides a remedy against every person who "under the color of state law, deprives another of rights protected by the Constitution." *Collins v.*

*City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992); see 42 U.S.C. § 1983. To succeed on his claims under § 1983, Snyder must show both a predicate violation of his constitutional rights and that the violation caused his alleged harm. *Id*. Furthermore, to be liable under § 1983, "the defendant must possess a purposeful, a knowing, or possibly a reckless state of mind." *Kingsley v. Hendrickson*, 576 U.S. 389, 396 (2015).

### B.  First Amendment – Free Exercise Clause

Snyder alleges that Defendant Robinson, "the nurse," knowing he is a Seventh Day Adventist, "illegally injected [him] with [a] pharmaceutical drug to sedate [him]" in violation of his religious principles. *Compl.*, p. 4, Dkt. 2. Religious freedom is guaranteed by the free exercise clause of the First Amendment, which provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. amend. I; *see also Cantwell v. State of Conn.*, 310 U.S. 296, 303 (1940) (holding that the First Amendment's free exercise clause applies to the states through the Fourteenth Amendment). "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990). Thus, "[t]he government may not compel affirmation of religious belief, punish the expression of religious doctrines it believes to be false, impose special disabilities on the basis

of religious views or religious status, or lend its power to one or the other side in controversies over religious authority or dogma." *Id.* (citations omitted).

But "[n]ot all burdens on religion are unconstitutional," and "[t]he state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest." *United States v. Lee*, 455 U.S. 252, 257 (1982). The right to free exercise does not relieve a person from complying with a valid, neutral law or policy of general applicability. *Smith*, 494 U.S. at 879. In addition, the state may take reasonable steps to protect the public health and safety, and the state's authority is not nullified because an individual grounds his claim on religion. *C.f. Prince v. Massachusetts,* 321 U.S. 158, 166–67 (1944) (The state's authority "is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion....").

Courts apply two levels of scrutiny to laws or policies that allegedly burden religion under the free exercise clause. On the one hand, courts apply "the most rigorous of scrutiny" to laws burdening religion that are neither neutral nor of general application. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). Such laws will be found unconstitutional unless the government can show the law serves "a compelling interest and is narrowly tailored to advance that interest." *Id.* at 533. On the other hand, courts apply rational basis review to neutral laws or policies of general applicability. *Stormans,*

*Inc. v. Wiesman*, 794 F.3d 1064, 1075–76 (9th Cir. 2015). "Under rational basis review, we must uphold the rules if they are rationally related to a legitimate governmental purpose." *Id.* at 1084.

The Court liberally construed Snyder's Complaint as stating a claim that Defendant Robinson infringed on Snyder's religious freedoms by allegedly forcibly injecting him with medication in violation of his religious beliefs knowing that he was Seventh Day Adventist. *See, e.g., Holmes v. Silver Cross Hosp. of Joliet*, Ill., 340 F. Supp. 125, 130 (N.D. Ill. 1972). Robinson, however, has presented evidence by way of declaration and video footage of the incident that establishes Robinson was an MHS who assisted in the de-escalation of the conflict after Snyder verbally threatened an Emergency Department physician and was placed on mental health hold pursuant to I.C. § 66-326. Robinson is not a nurse, did not physically restrain Snyder, did not provide him an intramuscular sedative injection, and, critically, did not have any personal knowledge of Snyder's religious beliefs. Rather, Robinson merely tried to calm Snyder down and convince him to take his physician-ordered medication voluntarily.

Without any evidence that Robinson knew Snyder was a Seventh Day Adventist – a claim that Robinson denies, and Snyder does not refute with evidence – and without evidence that Robinson ordered Snyder be given a sedative, or that she physically restrained Snyder, or that she forcibly injected

MEMORANDUM DECISION AND ORDER - 20

Snyder with a sedative or other medication, Snyder's claim necessarily fails and must be dismissed. *Kingsley*, 135 S. Ct. at 2472.

### C. Fourteenth Amendment – Substantive Due Process

Snyder also claims that each of the hospital defendants forcibly injected him with sedative medication without his consent in violation of his substantive due process rights under the Due Process Clause of the Fourteenth Amendment.

Under the Due Process Clause, Snyder possesses a significant liberty interest in avoiding the forcible injection of medication without his consent. *Washington v. Harper*, 494 U.S. 210, 229 (1990) (holding "forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty"). But a person's liberty interest in avoiding forcible administration of medication is not unconditional. *Id*. It must be balanced against the relevant state interests to determine whether a constitutional right is violated. *See Youngberg v. Romeo*, 457 U.S. 307, 320 (1982). In addition, only official conduct that is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience" in depriving an individual of their liberty interest is cognizable as a violation of due process. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n. 8 (1998); *see also Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010); *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006).

This "stringent requirement" is intended to "differentiate" constitutional claims from claims properly brought under "local tort law." *Id.* In the context of an individual placed on a physician hold under state law, the Supreme Court has instructed that a governmental actor's conduct meets this threshold, and exceeds constitutional bounds, only when that actor's decision "is such a substantial departure from accepted professional judgment, practices, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982).

As detailed above, a physician ordered that Snyder be placed on a physician hold and injected with a sedative in accordance with state law. Idaho Code § 66-326 explicitly allows a physician to detain, treat, and order the restraint of individuals "at a hospital at which the person presented or was brought to receive medical or mental health care" if the physician at such hospital "has reason to believe that the person is gravely disabled due to mental illness or the person's continued liberty poses an imminent danger to that person or others." I.C. § 66-326; *see also* I.C. § 66-317(13)(b) (defining "gravely disabled"); I.C. §§ 66-341 & 66-345.

These Idaho statues serve the legitimate and important state interest of ensuring the safety of hospital staff, other patients, and the patients' own safety and further comport with constitutional requirements for providing medication to a

**MEMORANDUM DECISION AND ORDER - 22**

patient without consent—a finding that a patient presents a danger to himself or others. *See Harper*, 494 U.S. at 236; *Morgan v. Rabun*, 128 F.3d 694, 697 (8th Cir. 1997) (finding that if a doctor found the patient to be a danger to himself or others, then his substantive due process rights were not violated). Hospital administrators "have a vital interest in ensuring the safety of their staff, other patients, and of course in ensuring the patients' own safety." *Morgan*, 128 F.3d at 697 (citing *Harper*, 494 U.S. at 227). Courts have therefore held that the due process clause permits the state to forcibly inject a patient with a sedative or other types of drugs if an appropriate professional determines the patient poses a danger to himself or others and the treatment is in the patient's medical interest. *See Harper*, 494 U.S. at 227; *Morgan*, 128 F.3d at 697. Such decisions made by the appropriate professional "are entitled to a presumption of correctness." *Youngberg*, 457 U.S. at 324.

Here, the evidence makes clear that the hospital defendants' actions furthered the legitimate state purpose of ensuring that Snyder did not injure himself or anyone else and that such actions were done in good faith and were not excessive given the behaviors Snyder displayed. As shown by the medical records, the treating physician, exercising his professional medical judgment, reasonably determined Snyder to be a danger to himself and in need of emergency treatment due to an overdose of methamphetamine and amitriptyline. Snyder's medical

**MEMORANDUM DECISION AND ORDER - 23**

records and the declarations submitted in this case demonstrate that not only was
Snyder overdosing on methamphetamine and amitriptyline, as well as expressing
suicidal ideations, but was also verbally abusive and physically threatening to
hospital staff, such that law enforcement was dispatched to the hospital for a
possible assault on a health care worker.

Critically, none of the hospital defendants made the medical decision to
place Snyder under mental health hold or provide him with medication – and none
of them injected Snyder with the sedative medication. Rather, Robinson simply
tried to talk to Snyder to calm him down and convince him to take the medication
ordered by the doctor voluntarily, and Horton and Bowcut only assisted in the
physical restraint ordered by the doctor due to Snyder's increasingly aggressive
and non-compliant state. Such actions, which sought to carry out the physician's
orders based on the reasonable determination that Snyder presented a danger to
himself or others, did not violate Snyder's substantive due process rights.

### D.    *Fourth Amendment – Excessive Force*

Based on its liberal construction of the Complaint in its Initial Review
Order, the Court determined that Snyder had pled a Fourth Amendment claim for
use of excessive force against Bowcut and Horton and Officer Debias based on the
allegation that these defendants violently attacked Snyder without provocation
during the course of a "seizure."

MEMORANDUM DECISION AND ORDER - 24

Snyder's excessive force claims, however, collide with the rule from *Heck v. Humphrey*, 512 U.S. 477 (1994). "Heck bars a § 1983 action that would imply the invalidity of a prior conviction if the plaintiff could have sought invalidation of the underlying conviction via direct appeal or state post-conviction relief, but did not do so." *Martin v. City of Boise*, 920 F.3d 584, 613 (9th Cir. 2019). By noting the "strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction," *Heck*, 512 U.S. at 484, the Supreme Court in *Heck* reiterated its long-standing concern that judgments be final and consistent, and its disinclination to expand opportunities for collateral attack on criminal convictions, thereby furthering principles of finality and consistency, *id.* at 484-485. In cases where the plaintiff has alleged a claim of excessive force by a law enforcement officer, the officer's conduct must be "distinct temporally or spatially from the factual basis for the [plaintiff's] conviction," to avoid dismissal. *Beets v. Cnty. of Los Angeles*, 669 F.3d 1038, 1042 (9th Cir. 2012) (citing Smith v. City of Hemet, 394 F.3d 689, 699 (9th Cir. 2005). Whether Snyder's civil action is barred by the *Heck* preclusion doctrine is a question of law. *Id.* at 1041.

In *Beets*, the parents of a Glenn Patrick Rose ("GPR") filed a § 1983 claim, alleging that a deputy used excessive force when he shot and killed GPR. The Ninth Circuit affirmed the district court's dismissal of the action pursuant to *Heck* on the grounds that the conviction of GPR's companion on several counts,

including aiding and abetting in the assault on a peace officer, precluded plaintiffs from attempting to show that the deputy used excessive force. 669 F.3d at 1040. In affirming the district court, the Ninth Circuit observed that the deputy had acted during the course of the criminal activity and brought such activity to an end, and the alleged excessive force was within the temporal scope of the convicted person's crime for which they bore responsibility. *Id.* at 1044-45. Thus, according to the court in *Beets*, the deputy's actions could not be separated from GPR and his companion's criminal activity in resisting arrest by force and assaulting police officers, of which GPR's companion was convicted. In other words, to find that the deputy used excessive force in shooting and killing GPR during the course of this criminal activity would necessarily undermine the conviction of GPR's companion and therefore such claims were barred by *Heck.*

Likewise, in this case, nothing separates Snyder's assault and battery on the health care workers and other "certain personnel," crimes for which Snyder was convicted, and the alleged excessive force by Defendants Horton, Bowcut, and Debias. These Defendants' attempts to restrain Snyder occurred in response to Snyder's assaultive conduct, to which Snyder pled guilty, and were part of a single act. Therefore, a finding that these Defendants used excessive force in restraining Snyder would necessarily imply the invalidity of Snyder's conviction for assault

and battery of these same individuals. Such claims are thus precluded by *Heck* and must be dismissed without leave to amend.

## ORDER

**IT IS ORDERED that:**

1.    Defendant Codey Debias' Motion for Summary Judgment (Dkt. 21) is GRANTED.

2.    Kootenai Defendants' Motion for Summary Judgment (Dkt. 25) is GRANTED.

3.    Snyder's Motion to Stay (Dkt. 29) is DENIED.

4.    Snyder's Motion for Reconsideration for Appointment of Counsel (Dkt. 30) is DENIED as MOOT.

5.    Snyder's Motion Clerk to Distribute Letter to Defendants (Dkt. 34) is DENIED as MOOT. The Clerk distributed Snyder's letter to Defendants.

6.    Snyder's Motion: Additional Information for Motion to Stay (Dkt. 35) is DENIED as MOOT.

DATED: July 28, 2022

B. Lynn Winmill
U.S. District Court Judge